UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                    Court File No. 16-cr-144 (RHK/LIB)

        Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Justin Edward Wylie,

        Defendant.

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1) and Local Rule 72.1, upon Defendant Justin Edward Wylie's ("Defendant") Motion to Suppress Any Statements Made By Defendant, [Docket No. 26], and upon Defendant's Motion to Suppress Any Evidence Obtained as a Result of Any Illegal Searches. [Docket No. 27]. The Court held a motions hearing on June 30, 2016, regarding the parties' pretrial motions.[1] The Court took the parties' pretrial motions under advisement at that time.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Any Statements Made By Defendant, [Docket No. 26], be **DENIED**, and that Defendant's Motion to Suppress Any Evidence Obtained as a Result of Any Illegal Searches, [Docket No. 27], be **DENIED**.

## I.    BACKGROUND AND STATEMENT OF FACTS

### A.  Background

Defendant is charged with fifteen (15) counts of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2251(e); five (5) counts of distribution of child

---

[1]The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 33].

pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1); one (1) count of receipt of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1); and one (1) count of possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2). (Indictment [Docket No. 1]).

### B. Facts

The record presently before the Court indicates that in February of 2014, Special Agent Jesse Smith ("SA Smith") of the North Dakota Bureau of Criminal Investigation conducted an undercover peer-to-peer file sharing investigation of Internet Protocol ("IP") address 24.11.236.180, which was associated with a target in Breckenridge, Minnesota. (Gov't's Ex. 27-1 at 3–4).[2] During the investigation, SA Smith used undercover investigative software to download computer files containing known images of child pornography from a host computer with IP address 24.11.236.180 that was running peer-to-peer file sharing software. (Id.). Pursuant to an administrative subpoena, SA Smith learned that IP address 24.11.236.180 was registered under the name A.H. at 405 South 9th Street Apt. A, in Breckenridge, Minnesota. (Id. at 3).

On February 2, 2014, SA Smith was able to successfully download from the host computer associated with IP address 24.11.236.180 a three (3) minute and twenty (20) second movie file containing what readily appeared to SA Smith to be child pornography. (Id.). On February 5, 2014, SA Smith also downloaded from the host computer associated with IP address 24.11.236.180 three (3) additional movie files which also contained what readily appeared to SA Smith to be child pornography. (Id.).

---

[2] Government's Exhibit 27-1 is the warrant application, supporting affidavit, and warrant now at issue. At the motions hearing, the Court addressed the fact that the warrant application, supporting affidavit, and warrant, which was offered into evidence as Government's Exhibit 27-1, was not properly paginated. The parties agreed that the last page of the exhibit was actually page three of the search warrant, and the parties further concurred that there were only twelve pages and not fifteen pages as the numbering in the lower right corner might appear to indicate. (June 30, 2016, Motions Hearing, Digital Recording at 10:35–10:57 a m.).

On February 27, 2014, SA Smith informed Detective Sergeant Natalie Butenhoff ("DS Butenhoff") of the Breckenridge Police Department of his investigation, and he provided her with a DVD containing the files downloaded from the host computer associated with IP address 24.11.236.180. (Id.). On March 14, 2014, DS Butenhoff verified with the Breckenridge Public Utilities Department that 405 South 9th Street, Apt. A, in Breckenridge, Minnesota, was registered in the name of A.H. attention Justin Wylie.

On March 14, 2014, DS Butenhoff drafted an application for a warrant to search the premises described as 405 South 9th Street, Apt. A, in Breckenridge, Minnesota. (Id.). DS Butenhoff's affidavit in support of the application for a warrant to search 405 South 9th Street, Apt. A, in Breckenridge, Minnesota, contained the details of SA Smith's and DS Butenhoff's investigations as set forth above. (Id.). The affidavit also contained SA Smith's qualifications, DS Butenhoff's qualifications, and descriptions of the contents of each movie file SA Smith downloaded from the host computer associated with IP address 24.11.236.180. (Id.). In that application, DS Butenhoff also attested that, based on her knowledge, experience, and training on cases involving child exploitation and child pornography, collectors of child pornography often keep it in their home and that she had good reason to believe that evidence of child pornography would be found at the property described in the application for a search warrant. (Id.).

On March 14, 2014, a District Court Judge for the State of Minnesota, Eighth Judicial District, County of Wilkin, determined that probable cause supported the issuance of the search warrant for the property now at issue. (Id.). That search warrant authorized a search for child pornography; information, correspondence, records, documents, or other materials pertaining to the possession, receipt, or distribution of child pornography; records evidencing ownership of

digital media devices and removable storage; any computer, computer system, and related peripherals; digital cameras; scanners; any input/output peripheral devices; hardware and software manuals; and any electronic data storage devices. (Id.).

On March 14, 2014, six officers, including DS Butenhoff, her Chief, and four other agents, executed the search warrant for the property located at 405 South 9th Street, Apt. A, in Breckenridge, Minnesota. (June 30, 2016, Motions Hearing, Digital Recording at 11:00–11:03 a.m.). The four agents were dressed in tactical gear, DS Butenhoff was in tactical pants with a polo shirt, and the Chief was wearing a police uniform. (Id.). Each of the officers was armed with a service weapon, however, no weapons were ever drawn. (Id.). When the search warrant was executed, the Defendant, his girlfriend, and her nine month old child were present in the apartment. Defendant and his girlfriend were pat searched upon initiation of the search warrant execution, and then his girlfriend was allowed to stay in the kitchen to feed her nine month old child. (Id. at 11:03–11:05 a.m.). Defendant was seated in the living room. (Id.). DS Butenhoff testified that upon her entry into the apartment upon the execution of the search warrant, she personally told Defendant he was not under arrest, and she further testified that she did not hear anyone tell him anything to the contrary. (Id. at 11:04–11:06 a.m.).[3]

After the apartment had been secured, but before the officers began conducting their search, DS Butenhoff asked Defendant if he would be willing to be interview, and if he would be willing to step outside to conduct that interview. (Id. at 11:07–11:08 a.m.). Defendant acknowledged that he was willing to speak with DS Butenhoff, at which time the two stepped out of the apartment. (Id.). Upon exiting the apartment, DS Butenhoff and Defendant walked to the entrance of the apartment building which had an unlocked exit on each end of the public

---

[3] DS Butenhoff did note at the evidentiary hearing that during the initial execution of the search warrant while Defendant was in the apartment and officers were securing the apartment, Defendant would not have been allowed to leave, although he was not told this. (Id. at 11:13–11:16 a m.).

hallway. (Id. 11:07–11:09 a.m.). Upon reaching the building's doorway, DS Butenhoff turned on her recorder and proceeded to interview Defendant. (Id. at 11:08 a.m.–11:09 a.m.).

Defendant was not restrained during the interview. (Id. at 11:07–11:09 a.m.). No threats were made to Defendant during the interview, and at no time did DS Butenhoff raise her voice to Defendant. (Gov't's Ex. 26-1). Defendant did not attempt to leave the public hallway area where DS Butenhoff was interviewing him. (June 30, 2016, Motions Hearing, Digital Recording at 11:08–11:09 a.m.). DS Butenhoff testified that the recorder she used to record the interview was at all times in plain view of Defendant. (Id. at 11:08–11:10 a.m.).

DS Butenhoff began the interview by stating date, time, and location information, and asking Defendant his basic identification information. (Gov't's Ex. 26-1 at 00:00–00:46).[4] After the identification information, DS Butenhoff proceeded to ask Defendant questions regarding his cell phone service and provider information. (Id. at 0:46–1:14). DS Butenhoff then informed Defendant that he was not under arrest, and she read Defendant a Miranda warning. (Id. at 1:15–1:46).

Shortly after the interview began, Defendant asserted that he did not know why the police were at his house, and DS Butenhoff informed Defendant she would give him a copy of the search warrant and that the police had information concerning child pornography on the computer located in Defendant's apartment. (Id. at 1:44–2:35). After explaining the reasons the police were at Defendant's apartment, DS Butenhoff asked Defendant the type of electronic devices he had, if he wanted to share his passwords with DS Butenhoff, and for any alternative email addresses Defendant had. (Id. at 2:36–13:07). DS Butenhoff then questioned Defendant about the contents of his electronic data storage, which of those device contained child

---

[4] While DS Butenhoff asserted on the recording that it was May 14, 2014, the record reflects, and the parties agreed at the motions hearing, that it was in fact March 14, 2014, when the interviewed occurred. (See Gov't's Ex. 26-1; June 30, 2016, Motions Hearing, Digital Recording, at 11:10–11:12 a.m.).

pornography, and the source from which he had obtained that child pornography. (Id. at 13:08–18:35).

Approximately eighteen minutes into the interview the following exchange took place:

Butenhoff:     Ok. And this is kind of your time to tell me the truth because otherwise you know I probably wouldn't be here if I didn't know that you did share.

Defendant:     [Inaudible] share [inaudible].

Butenhoff:     Ok.

Defendant:     [Inaudible].

(Id. at 18:35–19:00). Approximately twenty minutes into the interview the recorder accidently turns off and is then restarted. (Id. at 20:00). The majority of the remainder of the interview concerns the subjects of the child pornography, the source of the child pornography, and other people who would have had access to Defendant's apartment. (20:00–29:16). The last two minutes of the interview concern additional cell phones found in Defendants apartment. (Id. at 29:16–31:15).

Defendant was not arrested at the conclusion of the interview with DS Butenhoff. (Id. at 11:09 a.m.). At no time while police were at his apartment was Defendant ever placed in handcuffs.

Defendant was interview a second time, on January 26, 2016, approximately two years after his first interview. (See Gov't's Ex. 26-2). SA Shane Ball and DS Butenhoff approached Defendant while he was sitting in his car outside of his then residence, and they asked Defendant if he would be willing to speak with the officers. (June 30, 2016, Motions Hearing, Digital Recording at 11:26 a.m.). Defendant agreed to speak with them, and Defendant then led SA Ball and DS Butenhoff into his apartment so the three could speak. (Id. at 11:26–11:27 a.m). Once the three individuals were inside Defendant's apartment, SA Ball and DS Butenhoff proceeded to

interview Defendant. (Id.). SA Ball was in "plain clothes," and while SA Ball and DS Butenhoff were armed with their service weapons, the guns remained in their holsters at all times during the interview. (Id.). Before the interview began, DS Butenhoff turned on a digital audio recorder. (Id.).

At the motions hearing, SA Ball testified that, prior to making contact with Defendant, he and DS Butenhoff did not discuss whether or not to read Defendant a Miranda warning at this second interview. (Id. at 11:37 a.m.). Neither DS Butenhoff nor SA Ball read Defendant a Miranda warning during the January 26, 2016, interview. (See Gov't's Ex. 26-2).

Defendant was not restrained in any way during the interview. (June 30, 2016, Motions Hearing, Digital Recording at 11:27 a.m.). No threats were made to Defendant during the interview, and at no time did the officers raise their voices to Defendant. (See Gov't's Ex. 26-2). Defendant did not ask the officers to leave the apartment at any time during the interview. (See Id.). Defendant's demeanor during the course of the interview and the encounter in general was decent, responsive, and cooperative. (Id.; June 30, 2016, Motions Hearing, Digital Recording at 11:28 a.m.). SA Ball testified at the evidentiary hearing that he would not have stopped Defendant from leaving, if he had attempted to leave the interview, and that he communicated to Defendant that the SA Ball and DS Butenhoff would leave if Defendant wanted them to leave. (June 30, 2016, Motions Hearing, Digital Recording at 11:29 a.m.). SA Ball also testified that DS Butenhoff began recording the interview once the individuals got into the apartment and that the recorder was in plain view of the Defendant throughout the interview. (Id. at 11:30 a.m.). SA Ball testified that the officers did not have any type of substantive conversation with Defendant before or after the recording. (Id.). Once the three individuals entered the apartment, SA Ball testified that they primarily stood in the living area, and that Defendant eventually led them to a

"work room office" when they began talking about the computers. (Id. at 11:29 a.m.). SA Ball

also testified that the officers did not lock the door or stand next to the door to prevent Defendant

from leaving. (Id. at 11:29–11:30 a.m.). Defendant was not arrested at the conclusion of the

interview.

  Shortly after the second interview began, the following exchange took place:

| | |
|---|---|
| SA Ball: | [Inaudible] If you get tired of talking to us, tell us you're tired of talking to us, we leave. We're not going to arrest you at the conclusion of this interview or anything like that. Ok? |
| Defendant: | Ok. |
| SA Ball: | You get that? |
| Defendant: | Yes. |
| SA Ball: | Ok. |
| Butenhoff: | Ok, I just want to put the date on here, just so we have the date and time, January 26, 2016, and its 1:14 p.m. And, Justin you said you're, you're willing to talk to us? |
| Defendant: | Yes. |
| Butenhoff: | Without any issue and you can, like Agent Ball said, you can stop at any time. |
| SA Ball: | And we're in your house, which is 1305 11th Street North, Apartment number 11, Wahpeton. |
| Defendant: | That's correct. |

(Gov't's Ex. 26-2 at 0:00–0:36). Approximately seventeen minutes into the interview, Defendant

allowed DS Butenhoff to look through his computer while SA Ball conducted the interview. (Id.

at 18:50–19:10). The majority of the remainder of the interview pertains to the individuals

pictured in the child pornography, the sources of that child pornography, the history of

Defendant's use of child pornography, and Defendant's involvement in any child pornography

since the search warrant was executed back on March 14, 2014. (<u>Id.</u> at 0:36–57:17). Defendant remained cooperative during the entire interview. (<u>See</u> <u>Id.</u>).

Approximately forty minutes into the interview, SA Ball reiterated that even if DS Butenhoff found child pornography on the laptop currently in Defendant's possession, Defendant was not going to be arrested at the end of the interview. (<u>Id.</u> at 39:30–40:00). Immediately following that, the following exchange took place:

Butenhoff:      And, and we're going to stay to our word, but we need to know that you're going to be honest with us, you were pretty honest when I interviewed you the first time, and like he said, it's not going to change a lot, but when this is all said and done, and we have to say, ah no he kind of lied to us that second time we came and talked to him, sorry about that judge. It, that's not on us, it's going to be on you.

Defendant:      Ok, so what questions do you have for me right now, is there child porn on, on my devices? Am I sexual active with underage children right now?

SA Ball:        Mm, hmm.

Defendant:      That's what you're worried about. I've already told you everything I've searched for on the computers, which I haven't downloaded anything so there's physically nothing on there, besides the history. And the last time I had sex was with my ex-girlfriend, which was when, ah when was that

SA Ball:        [Inaudible] we don't need a date.

Defendant:      [Inaudible] domestic assault crap happened.

Butenhoff:      Ok.

SA Ball:        Well, Ok, so when we leave here, um, we'll fire up some subpoenas and find out your browsing history form the internet provider, so as long as we're good, all is good, right? I, I don't want to, what I don't want to have happen is to go back find that you your browsing history is different, um then, then, what we're saying, because if we, if what we're saying is true, all good, your truthful with us, you know, your case is still your case, whatever's going to happen is going to happen, that's not up to us, that's up to prosecutors and judges. But I don't want to be in a situation and you don't want us to be in a situation where yah, you know, he's told us straight up, very clearly, he didn't do it this time and here's evidence of that happening. That's bad for you, that does, it makes you look like

untruthful person and you're at least by and large truthful the first conversation as to what happened and I think a good bit of the time you've been truthful with us today. So, I'm just sort of giving you one last out here man because you gotta you know eventually you're going to face this and I'd rather you see you face it doing the right thing than face it doing the wrong thing.

Butenhoff:    And you gotta, I mean, you gotta think about it, Justin, it's really, it is an addiction and you know it an addition, it's been that way for a long, long time. And you have two little boys that look up to daddy for honesty, for their trust, for everything. And we want you to be with those little guys, but we want you to provide them with that honesty and that trust and if you can't, if you can't be honest with yourself it's going to be really hard to be honest with them. So it's better to take this all, get it done with at one time, and then perhaps you can seek some you know good treatment instead of you know this piecemeal kind of stuff that you're, you know, feeding the habit a little bit with this and maybe counseling here and there, that, that's not going to do anything. You know?

Defendant:    I'm going to prison.

SA Ball:      Well, you know that, that thing that's going on right here right now, that, this, this right here that you're feeling, you gotta get that off your chest. And you get that off your chest by being straight up with what happened and handling it like a man and I can tell you this much, I can guarantee you this much, this goes away when you do the right thing. Right, that doesn't change sort of the future, but it will make you feel better, because it's the right thing to do. And you're a father, you're raising kids, and your kids feel bad because they do something wrong, they tell dad and then it gets better.

Butenhoff:    And they're still there for you. Right? If your kids broke something, are you, are you going to disown them? No. They're going to be right there for you.

SA Ball:      People make mistakes, people with addiction fall off the wagon, it happens.

(Id. at 39:55–44:10). After that exchange, Defendant began telling SA Ball and DS Butenhoff about his internet browsing activities, including pornography. SA Ball and DS Butenhoff ended the interview by giving Defendant their contact information and telling him to contact them if he

remembered anything that he wanted to tell them. (Id. at 53:00–57:17). At the conclusion of the interview, Defendant was not arrested and the officers left Defendant's apartment. (Id.).

Defendant was interviewed again for a third time on May 18, 2016, by SA Ball, while SA Ball and his partner were transporting Defendant from the Wilkin County Jail to the Federal Courthouse in Minneapolis, Minnesota, after Defendant had been arrested on the charges which are now the subject of the present Indictment. (Gov't Ex. 26-3; June 30, 2016, Motions Hearing, Digital Recording at 11:32 a.m.–11:33 a.m.). As Defendant was in custody and being transported during this third interview he was restrained. (Id.). Defendant was restrained during the transportation with a belly chain and handcuffs per FBI policy. (Id. at 11:32 a.m.–11:35a.m.). Defendant's hands were cuffed in front of his person. (Id.). Defendant was seated in the front passenger's seat of a sport utility vehicle without police cages inside the vehicle, and SA Ball sat in the back seat directly behind Defendant, while SA Ball's partner drove. (Id.). No threats were made to Defendant during the interview, and at no time did the officers raise their voices to Defendant. (Gov't Ex. 26-3). Defendant's demeanor during the course of the interview was cordial and cooperative. (June 30, 2016, Motions Hearing, Digital Recording at 11:33 a.m.). At the motion hearing, SA Ball testified that he began recording the conversation as soon as he and the Defendant got into the vehicle. (Id. at 11:32 a.m.). SA Ball also testified that no substantive conversation took place before the recording. (Id. at 11:32–11:34 a.m.).

As soon as the interview began, SA Ball informed Defendant he was in custody, read Defendant a Miranda warning, and gave him a written copy of his rights to read. (Gov't Ex. 26-3 at 2:00–2:51). SA Ball then asked Defendant if he wanted to talk to SA Ball to which Defendant responded, "Sure." (Id. at 2:50). After that Miranda warning, SA Ball explained to Defendant where he was going and he obtained booking information from the Defendant. (Id. at

2:50–6:50). SA Ball then began asking Defendant about the child pornography already found during the investigation, any other illegal activities Defendant had committed stemming from the child pornography, and Defendant's past leading up to the child pornography. (Id. at 6:50–27:30). The substantive interview portion of the interview regarding Defendant's activities which are now the subject of the present Indictment only lasted approximately nineteen (19) minutes. (Id. at 6:56–26:00). For the next two hours, the occupants of the vehicle rode in silence listening to the radio, except for once when SA Ball asked Defendant if he was still alright and once when the officers spoke about contacting the Marshall service because the trip to the Minneapolis Federal Courthouse was nearing completion. (Id. at 29:15–2:32:12).

## II. DEFENDANT'S MOTION TO SUPPRESS ANY STATEMENTS MADE BY DEFENDANT. [Docket No. 26]

Defendant moves the Court for an order suppressing statements he made on March 14, 2014; on January 26, 2016, and on May 18, 2016. (See Def.'s Mot. to Suppress Any Statements Made by Def. [Docket No. 26]).

In support of his motion to suppress the March 14, 2014, statements Defendant contends that his freedom of movement was restricted to the point that he was effectively in custody during the execution of the search warrant of his residence and the interview on March 14, 2014, such that the statements Defendant made before he was provided with a Miranda warning should be suppressed. In support of his motion to suppress the January 26, 2016, statements Defendant argues that his freedom of movement was restricted to the point that he was effectively in custody during the interview in his apartment such that the officers were required to provide him with a Miranda warning before interrogating him. The Defendant makes no specific argument in regard to his May 18, 2016, statement.

**A.  Standard of Review**

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)).

A defendant may waive the Miranda rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

**B.  Analysis**

The statements that Defendant seeks to suppress are categorized into three groups: (1) the statements Defendant made on March 14, 2014, during the execution of the search warrant on his apartment prior to the reading of the Miranda warning;[5] (2) the statements made at his new apartment on January 26, 2016; and (3) the statements Defendant made while in custody after his arrest on May 18, 2016.

---

[5] Defendant does not challenge the March 14, 2014, statements made after he was read Miranda warnings. At the motions hearing, Defendant's counsel clarified that he believed Defendant was in custody during the interview ancillary to the execution of the search warrant, and therefore, everything prior to the reading of the Miranda warning should be excluded. (June 30, 2016, Motions Hearing, Digital Recording at 11:42–11:45 a.m.).

### 1.  March 14, 2014, Statements

Defendant first asks the Court to suppress the statements he made to DS Butenhoff, on March 14, 2014, during the interview prior to her reading of <u>Miranda</u> warnings. <u>Miranda</u> warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" <u>Stansbury</u>, 511 U.S. at 322 (quoting <u>Miranda</u>, 384 U.S. at 444). To be subject to suppression under <u>Miranda</u>, a statement must be made while in custody and in response to interrogation. <u>United States v. McGlothen</u>, 556 F.3d 698, 701 (8th Cir. 2009) (citing <u>United States v. Londondio</u>, 420 F.3d 777, 783 (8th Cir. 2005)). It is undisputed that the DS Butenhoff's express questioning of Defendant constituted interrogation. It is also undisputed that DS Butenhoff gave Defendant <u>Miranda</u> warnings approximately one minute into the interview. (Gov't Ex. 26-1 at 1:15–1:46). Accordingly, the sole issue before the Court is whether Defendant was in custody for the purpose of <u>Miranda</u> at the time before DS Butenhoff read Defendant the <u>Miranda</u> warnings. <u>See</u> <u>United States v. Axsom</u>, 289 F.3d 496, 500 (8th Cir. 2002) ("the undisputed facts establish that [the officers] were interrogating [the defendant]. To determine whether <u>Miranda</u> rule applies, we must examine whether [the] interrogation was custodial.")

The Eighth circuit has explained:

[W]e outline six common indicia of custody which tend either to mitigate or aggravate the atmosphere of custodial interrogation. The indicia are: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during the questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

> The first three indicia are mitigation factors, which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody. We have emphasized these six indicia of custody are representative and are not exclusive. A finding of custody does not require the factual circumstance of a case to present all indicial; and a particular strong showing of one factor may compensate for a lesser or non-existent showing of another factor.

Id. at 500–01 (internal citations omitted). "These factors, however, are not exclusive, and custody cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." United States v. Flores-Sandoval, 474 F.3d 1142, 1147 (8th Cir. 2007) (internal citations and quotation marks omitted). "The analysis depends upon a review of the totality of the circumstances, and [t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview." United States v. Sanchez, 676 F.3d 627, 630–31 (8th Cir. 2012) (internal citations and quotations omitted, alterations in Sanchez).

The first factor weighs heavily in favor of a finding that the suspect is not in custody when officers clearly inform the suspect that he is free to leave or decline questioning. Id. at 631. In the present case, this factor weighs mostly in favor of finding that Defendant was not in custody as DS Butenhoff initially told Defendant that he was not under arrest and DS Butenhoff asked Defendant if he would voluntarily step out of the apartment to be interviewed. See United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006) ("While advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine. Such a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning.") (citing United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005). Accordingly, the fact DS Butenhoff informed Defendant prior to the

interview that he was not under arrest does mitigate in favor of finding that Defendant was not in custody; however, it does so moderately, as she did not, at that initial point, also tell him he could end the interview. See Ollie, 442 F.3d at 1138.[6]

The record presently before the Court is also somewhat limited regarding whether Defendant possessed the freedom to move about during the interview on March 14, 2014. Defendant was not physically restrained while the officers executed the warrant to search his apartment and DS Butenhoff testified that Defendant did not try to leave during the interview. Defendant was not told that that he could not leave; the interview was conducted in a public hallway with two visible and unlocked exits; and there were no other law enforcement officers present during the interview besides DS Butenhoff. The inquiry here is whether it would have appeared objectively to someone in Defendant's position whether or not they had freedom of movement. See United States v. Rosenblum, No. 7-cr-294 (JRT/FLN), 2008 WL 608297, at *5 (D. Minn. Jan. 16, 2008) (quoting Axsom, 289 F.3d at 503). On the present record, this second mitigating factor does not weigh strongly for or against a finding that Defendant was in custody. See Ollie, 442 F.3d at 1138 ("The record is silent on this issue because Mr. Ollie never tried to move about or leave the interview room. Because the record is thin, we believe that it is impossible to determine if Mr. Ollie retained his freedom of movement throughout the questioning.).

The third factor, which addresses whether Defendant initiated contact with the police or voluntarily acquiesced to the questioning by the police, mitigates in favor of finding that Defendant was not in custody as Defendant voluntarily agreed to leave the apartment to talk with DS Butenhoff. See Axsom, 289 F.3d at 501 (concluding that the third factor mitigated a finding

---

[6] Although this ability to end the interview at Defendant's discretion might be inferred from the totality of the circumstances since he had the opportunity to decline to be interviewed in the first instance where DS Butenhoff inquired at the outset if Defendant was even willing to be interviewed.

that the defendant had been in custody where he voluntarily acquiesced to police questioning). In the present case, DS Butenhoff asked Defendant if he would be willing to step outside to speak with her and Defendant said that he would.

The fourth factor, which addresses whether law enforcement used strong arm tactics against a suspect, does not aggravate in favor of finding that Defendant was in custody during the portion of the interview before DS Butenhoff gave Defendant a Miranda warning. The Court finds no evidence on the present record of strong arm tactics being used against the Defendant before or during the March 14, 2014, interview. Indeed, the present record shows there were no strong arm tactics employed even during the initial execution of the search warrant on Defendant's apartment; no guns were ever drawn; and while the search was conducted, the Defendant's girlfriend was permitted to remain in the kitchen feeding her nine month old child. Accordingly, the fourth factor does not aggravate in favor of Defendant being in custody during the interview.

Defendant contends that the fifth factor, which addresses whether the questioning took place in a "police dominated atmosphere," aggravated in favor of finding that Defendant was in custody during the interview, arguing that the presence of a large number of officers executing the warrant created a "police dominated atmosphere." The record in the present case, however, shows that, on March 14, 2014, while DS Butenhoff first made contact with Defendant in his apartment, she interviewed Defendant in the public entrance to his apartment building where she was the only law enforcement officer present. "When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial." Axsom, 289 F.3d at 502 (citing United States v. Erving L., 147 F.3d 1240, 1247 (10th Cir. 1998)). In addition, although there were additional officers in the apartment when the search warrant was

executed, the Eighth Circuit has found that the presence of an even greater number of officers in the home of an interviewed suspect did not render an interview custodial. See Axsom, 289 F.3d at 501 (concluding that mere presence of nine officers in the suspect's home was not sufficient to find that the atmosphere was police dominated).

The sixth factor, which addresses whether Defendant was arrested at the end of the interview, also does not aggravate in favor of finding that Defendant was in custody. Defendant was in fact not arrested upon the conclusion of his March 14, 2014, interview nor was he ever arrested that day. Likewise, at no time during the interview or the search of Defendant's residence was Defendant ever even handcuffed by police.

Upon consideration of the totality of the circumstance, the Court concludes that a reasonable person in Defendant's position would have objectively felt free to terminate the interview and, as such, Defendant was not in custody during the March 14, 2014, interview. Because Defendant was not in custody for the purposes of Miranda, Defendant is not entitled to have the statement he made before he was read a Miranda warning suppressed.[7]

Based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Any Statements Made By Defendant, [Docket No. 26], to the extent the motion pertains to the statements Defendant made before DS Butenhoff gave him a Miranda warning on March 14, 2014.

### 2. January 26, 2016, Statements

Defendant also asks the Court to suppress the entirety of the statements he made during the interview with DS Butenhoff and SA Ball on January 26, 2016, at Plaintiff's then residence.

---

[7] The mere fact that DS Butenhoff chose to give a Miranda warning to Defendant out of caution is not itself an indicia of "custody." See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (finding that defendant was not "in custody" during an interview in which the law enforcement officer gave a Miranda warning and then taped defendant's confession); United States v. Taylor, 480 F. Supp. 2d 1216, 1233 (D. Nev. 2007), aff'd, 380 Fed. App'x 570 (9th Cir. 2010).

Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury, 511 U.S. at 322 (quoting Miranda, 384 U.S. at 444). To be subject to suppression under Miranda, a statement must be made while in custody and in response to interrogation. United States v. McGlothen, 556 F.3d 698, 701 (8th Cir. 2009) (citing United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005)).

It is undisputed that the DS Butenhoff's and SA Ball's express questioning of Defendant constituted interrogation. It is also undisputed that the officers did not give Defendant a Miranda warning during the January 26, 2016, interview. (Gov't's Ex. 26-2). Accordingly, the sole issue on this aspect of the motion is again whether Defendant was in custody for the purpose of Miranda at the time of the January 26, 2016, interview. See Axsom, 289 F.3d at 500 ("the undisputed facts establish that [the officers] were interrogating [the defendant]. To determine whether Miranda rule applies, we must examine whether [the] interrogation was custodial.")

As noted above, this determination—of whether Defendant was in custody for the purpose of Miranda—requires a review, under the totality of the circumstances, of the six factors outlined by the Axsom Court, and ultimately it is dependent on whether or not a reasonable person[8] in Defendant's position would have felt free to end the interview. See Axsom, 289 F.3d at 500–01; Flores-Sandoval, 474 F.3d at 1147; Sanchez, 676 F.3d at 630–31.

The first factor weighs heavily in favor of a finding that the suspect is not in custody when officers clearly inform the suspect that he is free to leave or decline questioning. Sanchez, 676 F.3d at 631. In the present case, this factor weighs strongly in favor of finding that Defendant was not in custody as the officers initially told Defendant that he was not under arrest nor was he going to be placed under arrest at the conclusion of the interview; that he did not have

---

[8] This is an objective standard. See generally, United States v. Rosenblum, 2008 WL 608297, at *5.

to speak with the officers; and that he could tell the officers to leave at any time. See Ollie, 442 F.3d at 1138 ("While advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine. Such a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning.") (citing Czichray, 378 F.3d at 826. Accordingly, the officers informing Defendant at the onset of the interview that he was not under arrest and that he could end the interview at any time mitigates strongly in favor of finding that Defendant was not in custody. Ollie, 442 F.3d at 1138.

The record presently before the Court is silent regarding whether Defendant attempted to move about during the interview and whether the officers attempted to restrict any such movement. Accordingly, this second mitigating factor does not weigh heavily for or against a finding that Defendant was in custody. See Id. ("The record is silent on this issue because Mr. Ollie never tried to move about or leave the interview room. Because the record is thin, we believe that it is impossible to determine if Mr. Ollie retained his freedom of movement throughout the questioning.").[9]

The third factor, which addresses whether Defendant initiated contact with the police or voluntarily acquiesced to the questioning by the police, also mitigates in favor of finding that Defendant was not in custody as Defendant voluntarily agreed to talk to the officers even after first being told that he did not have to talk with the officers, and he was the one who led the officers from his vehicle outside into his apartment. See Axsom, 289 F.3d at 501 (concluding that the third factor mitigated a finding that the defendant had been in custody where he

---

[9] The Court notes, however, that it was Defendant who led the officers into his apartment and not the officers who ordered the Defendant into his apartment. Freedom of movement on the Defendant's part in this context might be inferred, especially when Defendant was also told at the outset that he could direct the officers to leave his apartment at any time.

voluntarily acquiesced to police questioning). In the present case, SA Ball testified that he asked Defendant if he was willing to speak to the officers before Defendant led the officers into Defendant's apartment. SA Ball also told Defendant at the beginning of the interview again that he was not required to talk with the officers and he could terminate the interview at any time.

The fourth factor, which addresses whether law enforcement used strong arm tactics against a suspect, does not aggravate in favor of finding that Defendant was in custody during the January 26, 2016, interview. While the officers did tell Defendant that it was in his best interest to be truthful and that "getting it off his chest" would make him feel better, their conduct did not rise to the level of strong arm tactics or deceptive stratagems. See Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001) (citing Bolder v. Armontrout, 921 F.2d 1359, 1366 (8th Cir. 1990); see e.g., United States v. Pierce, 152 F.3d 808, 813 (8th Cir. 1998) (indicating that a statement would be to the suspect's benefit if he cooperated with them is not improperly coercive); Bannister v. Armontrout, 4 F.3d 1434, 1440 (8th Cir. 1993) (providing that comments that it would be in the accused's best interest to cooperate did not render his statement involuntary in death penalty case)). As such, Defendant's will was not overborn by the officers' statements or conduct. Accordingly, the fourth factor does not aggravate in favor of Defendant being in custody during the interview.

The fifth factor, which addresses whether the questioning took place in a "police dominated atmosphere," does not aggravated in favor of finding that Defendant was in custody during the interview. On January 26, 2016, Defendant was interviewed in his own apartment after he voluntarily led the officers into this apartment. "When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial." Axsom, 289 F.3d at 502 (citing Erving L., 147 F.3d at 1247). In addition, although there were

two officers in the apartment, the Eighth Circuit has found that the presence of an even greater number of officers in the home of an interviewed suspect did not render an interview custodial. See Axsom, 289 F.3d at 501 (concluding that mere presence of nine officers in the suspect's home was not sufficient to find that the atmosphere was police dominated). Further, as noted above, the record demonstrates that the officers told Defendant at the beginning of the interview that they would leave if he asked them to do so.

The sixth factor, which addresses whether Defendant was arrested at the end of the interview, also does not aggravate in favor of finding that Defendant was in custody. Defendant was in fact not arrested upon the conclusion of his January 26, 2016, interview, even after he again admitted to possession of child pornography. Likewise, at no time during the second interview was Defendant ever handcuffed or physically restrained by either of the officers.

Given the totality of the circumstance, the Court concludes that a reasonable person in Defendant's position on January 26, 2016, would have objectively felt free to terminate the interview and, as such, Defendant was not in custody. Because Defendant was not in custody for the purposes of Miranda, Defendant is not entitled to have the statements he made during the January 26, 2016, interview suppressed because a Miranda warning was not provided.

Based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Any Statements Made by Defendant, [Docket No. 26], to the extent the motion pertains to the statements Defendant made during the January 26, 2016, interview.

### 3. May 18, 2016, Statements

Defendant also asks the Court, without making any specific argument in his moving papers, to suppress the statements he made during the interview with SA Ball on May 18, 2016,

while Defendant was being transported from the Wilkin County Jail to the Federal District Courthouse in Minneapolis, Minnesota.

Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury, 511 U.S. at 322 (quoting Miranda, 384 U.S. at 444). To be subject to suppression under Miranda, a statement must be made while in custody and in response to interrogation. United States v. McGlothen, 556 F.3d 698, 701 (8th Cir. 2009) (citing United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005)).

It is undisputed that the SA Ball's express questioning of Defendant on May 18, 2016, constituted interrogation. It is also undisputed that SA Ball gave Defendant Miranda warnings upon the initiation of the May 18, 2016, interview. (Gov't's Ex. 26-3). Finally, it is further undisputed that Defendant was in custody for the purpose of Miranda at the time of the May 18, 2016, interview, as he had already been arrested and was being transported by the FBI from the Wilkin County Jail to the Federal Courthouse in Minneapolis, Minnesota.

Accordingly, the only issue before the Court regarding Defendant's May 18, 2016, interview is whether Defendant's waiver of his rights was made intelligently, knowingly and voluntarily.

Before a statement procured through custodial interrogation can be admitted in court, the Government must demonstrate that a defendant's waiver of his Miranda rights was made intelligently, knowingly, and voluntarily. Miranda, 384 U.S. at 444, 475. The validity of a Miranda waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and intelligently

made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). "The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

1. Voluntariness

Courts assess whether a waiver of the Miranda rights was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." United States v. Contreras, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent." United States v. Turner, 157 F.3d 552, 555 (8th Cir.1998) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir.

2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

Defendant does not point in his moving papers to any particular factor which renders his Miranda waiver involuntary. Defendant offers no specific argument in his moving papers that the officers engaged in any specific coercive tactics that caused his will to be overborne during the interview. In fact, the Court's independent review of the audio recording of the May 18, 2016, interview indicates that the officers did not engage in coercive tactics. See United States v. Mims, 567 F.Supp.2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); see also United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant). Throughout the interview, SA Ball maintained a conversational tone and made no threats or promises to Defendant. Further, the Court's review of the recording shows that Defendant spoke willingly and cooperatively with SA Ball. The interview, which lasted only twenty-nine minutes, was also not coercive in its duration.[10] See Id. (noting that interrogation lasting more than two hours was not coercive in duration). Although, Defendant was restrained with handcuffs and a belly chain, he was restrained in the most comfortable way possible, and he was asked multiple times by the Agent during the trip if he was comfortable. Defendant was also allowed to sit in the front seat of the vehicle, which otherwise contained no cages or wall-type barriers. Finally,

---

[10] While the recording of the interview is more than two and a half hours long, as previously noted above, the occupants of the vehicle sat in silence listening to the radio for over two hours. (Gov't's Ex. 26-3 at 29:15–2:32:15). The recording is the length that it is because it was the length of the transportation drive from Wilkin County to Minneapolis.

Defendant's repeated refusal to admit to certain conduct stemming from the possession of child pornography—in the face of SA Ball expressing to Defendant several times that he found his answers unlikely or unbelievable—is itself an indication of his personal resolve and that his will was not overborne.

Based on the foregoing, and under the totality of the circumstances, the Court concludes that Defendant's waiver of his rights was voluntary.

2. Knowing and Intelligent

Next, the Court must consider whether Defendant's waiver of his Miranda rights was knowingly and intelligently made. Vinton, 631 F.3d at 483. The evidence in the record regarding Defendant's understanding of his rights and presence of mind during the May 18, 2016, interview consists of the audio recording of the interview.

The Court's independent review of the audio recording of the interview indicates that Defendant appeared to fully comprehend the conversation, understood the situation, understood the questions being asked of him, and provided contextually appropriate answers. The audio recording, further, provides that SA Ball read Defendant the Miranda warning, handed Defendant a written copy of the Miranda warning to review, and only after this then did Defendant acknowledge that he would be willing to talk to SA Ball.

Therefore, under the totality of the circumstances, the Court concludes that Defendant's waiver of his rights was both knowing and intelligent.

Based on the foregoing, the court recommends **DENYING** Defendant's Motion to Suppress Any Statements Made By Defendant, [Docket No. 26], to the extent the motion pertains to the statements Defendant made during the May 18, 2016, interview.

III.    **DEFENDANT'S MOTION TO SUPPRESS ANY EVIDENCE OBTAINED AS A RESULT OF ANY ILLEGAL SEARCHES. [Docket No. 27].**

Defendant moves the Court for an order suppressing any evidence obtained as a result of the March 14, 2014, execution of the search warrant for the premises described as 405 South 9th Street, Apt. A, in Breckenridge, Minnesota. (Def.'s Mot. to Suppress Any Evidence Obtained as a Result of Any Illegal Searches [Docket No. 27]).

### A.  Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d

692, 694 (8th Cir. 2009) (quoting <u>United States v. Reivich</u>, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" <u>United States v. Wiley</u>, No. 09–cr– 239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting <u>United States v. Solomon</u>, 432 F.3d 824, 827 (8th Cir. 2005)) (alterations in <u>Wiley</u>). In addition, the issuing court's "determination of probable cause should be paid great deference by reviewing courts." <u>Gates</u>, 462 U.S. at 236 (quoting <u>Spinelli v. United States</u>, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." <u>Id.</u> at 238–39 (quoting <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960)).

### B. Analysis

In his Motion to Suppress Any Evidence Obtained as a Result of Any Illegal Searches, [Docket No. 27], Defendant argues that "the search warrant [was] invalid because the only link between the defendant's residence and child pornography was an IP Address, and an IP Address does not sufficiently provide a nexus with the place searched: the Defendant's apartment." (Def.'s Mot. to Suppress Any Evidence Obtained as a Result of Any Illegal Searches, [Docket No. 27], at 2). Defendant also argues that the search warrant affidavit contains material omissions reasoning that the affidavit did not state "whether the Internet Service Provider used static or dynamic IP Address generation, which could affect whether the defendant, along with others, used the same IP Address." (<u>Id.</u>). Defendant fails to cite to any legal authority or caselaw to support his contention that the omission of whether the Internet Service Provider used static or dynamic IP Address generation constitutes a material omission. The Court notes, however, that

Defendant concedes that controlling Eighth Circuit caselaw contradicts his first basis for suppression. (See Id.) ("Defendant is aware that the 8th Circuit has ruled that IP Addresses may establish a 'fair probability' of a link with a residence . . . .").[11]

Based on the information in DS Butenhoff's affidavit in support of the application for the warrant to search the premises described as 405 South 9th Street, Apt. A, in Breckenridge, Minnesota, the Court concludes that the Eighth Judicial District Court Judge, State of Minnesota, County of Wilkin, had a substantial basis to conclude that probable cause existed to believe that evidence of a crime (i.e., child pornography) could be found at the premises described as 405 South 9th Street, Apt. A, in Breckenridge, Minnesota.

DS Butenhoff's affidavit in support of the warrant application refers to SA Smith's peer-to-peer internet investigation in which SA Smith, on multiple yet separate occasions, was able to download movie files containing what readily appeared to be child pornography from a computer associated with IP address 24.11.236.180, which SA Smith was able to independently confirm was registered, at the time, under the name A.H. at 405 South 9th Street, Apt. A, in Breckenridge, Minnesota. DS Butenhoff later further verified that 405 South 9th Street, Apt. A, in Breckenridge, Minnesota, was registered with the Breckenridge Public Utilities Department as belonging to A.H. attention Justin Wylie.

In this circuit, when determining whether probable cause exists to search a computer at a specific location, an IP address associated with a specific location at the time illegal internet activity associated with that IP address occurs has been found to be a sufficient basis to find a nexus between that unlawful use of the internet and the computer assigned that IP address. See

---

[11] To the extent Defendant may have sought to also argue that an IP address does not provide a sufficient link to Defendant's person his argument is misplaced. The search warrant was to search the apartment not to search Defendant himself. The nexus that must be established is between the search warrant application and the place to be searched. See generally United States v. Freeman, No. 10–cr–68 (JRT/RLE), 2010 WL 4386897, at *11 (D. Minn. May 13, 2010), adopted by 2010 WL 4386874 (D. Minn. Oct. 28, 2010).

e.g., United States v. Stults, 575 F.3d 834, 844 (8th Cir. 2009) (affirming finding of probable cause where affidavit in support of search warrant application referred to IP address that had been used to access child pornography sites was traced to a defendant); see also e.g., United States v. Freeman, No. 10–cr–68 (JRT/RLE), 2010 WL 4386897, at *11 (D. Minn. May 13, 2010) (finding nexus between child pornography and a computer at a physical address based on an email account, an IP address, and the home address to which the IP address was assigned), adopted by 2010 WL 4386874 (D. Minn. Oct. 28, 2010).

Accordingly, under Eighth Circuit case law, the reference to SA Smith's peer-to-peer downloading of files containing images of child pornography from the host computer associated with IP address 24.11.236.180 at the time that the IP address was associated with 405 South 9th Street, Apt. A, in Breckenridge, Minnesota, was a substantial basis on which the District Court Judge, Eighth Judicial District, State of Minnesota, County of Wilkin, could find that probable cause existed to search 405 South 9th Street, Apt. A, in Breckenridge, Minnesota, for child pornography.[12]

The Court's careful review of DS Butenhoff's affidavit in support of her application for the search warrant indicates that she presented the State District Court Judge with sufficient

---

[12] However, even if the Court were to assume arguendo that probable cause did not exist to believe that evidence of contraband could be found at the 405 South 9th Street, Apt. A, residence in Breckenridge, Minnesota, the Court would still conclude that Defendant's Motion to Suppress Any Evidence Obtained as a Result of Any Illegal Searches, [Docket No. 27], should be denied under the "good faith" exception set forth in United States v. Leon, 465 U.S. 897 (1984). "Under the Leon good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." Grant, 490 F.3d at 632 (citing Leon, 468 U.S. at 922). On the totality of the present record, as described throughout this Report and Recommendation, law enforcement does appear to have relied in good-faith on the warrant ultimately issued by the State District Court Judge to search the Defendant's apartment on March 14, 2014, and therefore, this militates against suppressing any evidence obtained during the search of the 405 South 9th Street, Apt. A, residence in Breckenridge, Minnesota. See Leon, 468 U.S. at 919–921 (exclusionary rule does not apply "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope"); see also United States v. Johnson, 219 F.3d 790, 791 (8th Cir. 2000) ("Even if we thought the warrant affidavit did not establish probable cause, the good faith exception to the warrant requirement would apply because the affidavit was sufficient to allow an officer to reasonably believe probable cause existed.").

specific facts for the issuing Judge to conclude there was a substantial basis to believe that evidence of the child pornography could be expected to be found at the 405 South 9th Street, Apt. A, residence.

Based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Any Evidence Obtained as a Result of Any Illegal Searches. [Docket No. 27].

## IV.   CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendant's Motion to Suppress Any Statements Made By Defendant, [Docket No. 26], be **DENIED**; and

2.  Defendant's Motion to Suppress Any Evidence Obtained as a Result of Any Illegal Searches, [Docket No. 27], be **DENIED**.

Dated: July 18, 2016                                  **  s/ Leo I. Brisbois        **
                                                      Leo I. Brisbois
                                                      U.S. MAGISTRATE JUDGE

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within

14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.